UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:14-CR-00061-TBR-CHL

UNITED STATES,                                                                                         Plaintiff,

v.

THOMAS SAYLOR,                                                                                       Defendant.

**MEMORANDUM OPINION AND ORDER**

As federal agents executed a search warrant at his residence, Thomas Saylor admitted to possessing and transmitting child pornography through means of interstate commerce. Four months later, a grand jury returned a four-count indictment against him. Saylor now asks this Court to suppress those statements because he volunteered them without notice of his Fifth Amendment rights as articulated by *Miranda v. Arizona*, 384 U.S. 436 (1966).

On this Court's direction, Magistrate Judge Lindsay held an evidentiary hearing on Saylor's motion to suppress. In a carefully reasoned opinion, Judge Lindsay concluded that Saylor's interview was noncustodial and, therefore, recommended that his motion be denied. Saylor objects to that conclusion because, in his view, the agents transformed his home into a police-dominated atmosphere and restricted his freedom to a degree proximate to formal arrest. Having reviewed the entire record with fresh eyes, the Court **ADOPTS** Judge Lindsay's Findings of Fact and Conclusions of Law and Recommendation (R. 30), **OVERRULES** Saylor's Objection (R. 34), and **DENIES** the Motion to Suppress (R. 20).

1

I.

A.

On March 17, 2014, Special Agent Tracey Riley of the Federal Bureau of Investigation obtained a warrant to search a "boarding" or "halfway" house in Louisville, Kentucky, as part of a child pornography investigation targeting Thomas Saylor. (R. 27 at 4–5, 35 (Riley's Testimony); *id.* at 80 (Hamilton's Testimony).) Saylor resided in the house with ten to twelve other registered sex offenders. (*Id.* at 4–5, 8, 35 (Riley's Testimony).) Ten law-enforcement officers from the FBI and Louisville Metro Police Department executed the search warrant on March 27, 2014.[1] (*Id.* at 5, 18–19.) All wore vests identifying themselves as either FBI agents or LMPD officers. (*Id.* at 19.)

The house manager allowed the team entry through the front door of the residence. (*Id.* at 8–9, 19–21.) With drawn weapons, the group proceeded to "clear" the three-story building, searching the various rooms for occupants and gathering them in the common area on the first floor. (*Id.* at 9; *see also id.* at 24 (describing common area).) While most of the residents were handcuffed during this process, law-enforcement officers freed them after establishing control over the scene. (*Id.* at 9–10, 17, 36–37.) Occupants were told that if anyone needed to leave, they were free to do so. (*Id.* at 9.)

An unidentified officer brandishing his or her firearm encountered Saylor in the hallway outside of his bedroom on the first floor. (*Id.* at 7, 11–12.) The unidentified officer announced Saylor's presence. (*Id.* at 11–12.) Special Agent Riley—who was behind the unidentified officer with her weapon holstered—recognized Saylor. (*Id.*) She told the unidentified officer that she saw Saylor and that she would handle the situation.

---

[1] Special Agent Riley also invited Kentucky Probation Officer Timothy S. Haubry to assist in executing the search warrant—namely, to identify which room belonged to Saylor. (R. 27 at 69–71 (Haubry's Testimony); *see also id.* at 14–15, 38 (Riley's Testimony).)

2

(*Id.*)  She asked the man if he was Thomas Saylor; he responded affirmatively.  (*Id.*)  She then asked something to the effect of:  "Would you mind stepping into the kitchen or having a seat in the kitchen?"  (*Id.* at 22; *see also id.* at 11–12 ("I asked if he'd be willing to talk to us.  Would he mind sitting in the kitchen.  It was getting cold in the living room."); *id.* at 32 ("I said . . . 'Would you mind stepping into the kitchen?  We'd like to talk to you.'").)  Unlike other residents, Saylor was not handcuffed at this time—or, in fact, at any time during the execution of the search warrant or the subsequent interview.  (*Id.* at 10–11, 17.)

Saylor agreed, and the pair went to the kitchen, which was located off of the same hallway where Special Agent Riley first encountered Saylor.  (*Id.* at 8, 11–12.)  Special Agent Riley asked Saylor if he'd like something to drink, and the two engaged in small-talk for a minute.  (*Id.* at 29; *see also id.* at 48 (Keown's Testimony).)  She told Saylor that the agents who wanted to speak with him would be in shortly.  (*Id.* at 29 (Riley's Testimony).)  She then left Saylor alone in the kitchen, although she and other officers generally kept eyes on him.  (*Id.* at 26–27.)  While no one read Saylor his *Miranda* rights or informed him that he was free to leave, no one told Saylor that he had to stay or that he had to talk with the officers either.  (*Id.* at 13, 32–33; *see also id.* at 49 (Keown's Testimony); *id.* at 82 (Hamilton's Testimony).)

Some fifteen minutes later, FBI Special Agent Adam Keown and LMPD Detective Shawn Hamilton interviewed Saylor in the kitchen.  (*Id.* at 26–27 (Riley's Testimony); *id.* at 47 (Keown's Testimony); *id.* at 81 (Hamilton's Testimony).)  While Special Agent Keown wasn't able to recall in detail, he thought Saylor "was already sitting down when [he and Detective Hamilton] entered the room."  (*Id.* at 62 (Keown's

3

Testimony).)  Regardless, Saylor sat on the far-side of the table, and Special Agent Keown and Detective Hamilton sat on the other-side, which happened to be closer to the kitchen's entrance.  (*Id.* at 57–59; *see also id.* at 81–82 (Hamilton's Testimony).)  There is no record evidence of any other law-enforcement officers participating in the interview or standing guard.  (*Id.* at 48–49 (Keown's Testimony); *id.* at 81 (Hamilton's Testimony).)

The interview itself lasted anywhere from fifteen to thirty minutes.  (*Id.* at 50 (Keown's Testimony) (estimating thirty minutes); *id.* at 83 (Hamilton's Testimony) (estimating between fifteen and twenty minutes).)  Special Agent Keown and Detective Hamilton initially questioned Saylor about his "online activity" in general and vague terms.  (*Id.* at 61–62 (Keown's Testimony); *id.* at 91 (Hamilton's Testimony).)  But Saylor made incriminating statements soon after the interview began.  (*Id.* at 50 (Keown's Testimony); *id.* at 83 (Hamilton's Testimony).)  Throughout the interview, Special Agent Keown described the tone as being "very conversational."  (*Id.* at 52 (Keown's Testimony).)  The gist of the conversation abruptly changed, however, when Saylor said that he intended to stab himself with the pen he had been using to write a statement.  (*Id.* at 52–53.)  Concerned for his safety and that of Saylor, Special Agent Keown took the pen and paper from Saylor and concluded the interview.  (*Id.* at 53–54.)

Even though Saylor confessed to possessing and transmitting child pornography, neither the FBI nor LMPD arrested him on March 27, 2014.  (*Id.* at 15, 38–39, 44–45 (Riley's Testimony).)  Under its standard operating procedure, the FBI will not typically arrest a person suspected of possessing or trafficking in child pornography following the execution of a search warrant unless the suspect poses an immediate danger to children.

4

(*Id.* at 15–16, 38–42; *id.* at 55–56 (Keown's Testimony); *id.* at 85–86 (Hamilton's Testimony).) However, Special Agent Keown passed Saylor's confession along to Special Agent Riley who then relayed the inculpatory statements to Officer Haubry. (*Id.* at 53 (Keown's Testimony); *id.* at 73 (Haubry's Testimony).). Officer Haubry contacted his supervisor to advise him of the situation, and Officer Haubry's supervisor instructed him to arrest Saylor on a probation citation. (*Id.* at 73–74 (Haubry's Testimony).) No one from the FBI or LMPD instructed Officer Haubry to arrest Saylor. (*Id.* at 15 (Riley's Testimony); *id.* at 74 (Haubry's Testimony); *id.* at 86 (Hamilton's Testimony).) The United States indicted Saylor in July 2014—almost four months after the events that transpired here. (*See* R. 1 at 1 (Indictment).)

**B.**

Saylor moved to suppress his statements on April 24, 2015. (R. 20 at 1–2.) On June 1, the Court referred Saylor's motion to Magistrate Judge Lindsay. (R. 23 at 1 (Order of Referral).) Judge Lindsay held an evidentiary hearing on July 22 and recommended that the Court deny Saylor's motion.[2] (R. 30 at 17.) On October 13, Saylor objected to Judge Lindsay's Report and Recommendation (R. 34 at 1.) It is well-settled that the Court reviews the objected-to portions of a report and recommendation *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); *see also United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (citing *United States v. Raddatz*, 447 U.S. 667, 674 (1980)) (holding that magistrate judge's ruling on dispositive motions, such as those to suppress evidence, must be reviewed *de novo*).

---

[2] Neither party requested a second evidentiary hearing, and the Court concludes that none is necessary. *See United States v. Goodwin*, 552 F. App'x 541, 548 (6th Cir. 2014) (holding decision to conduct evidentiary hearing on motion to suppress is left to district court's discretion).

## II.

"The Fifth Amendment says that an individual may not be 'compelled in any criminal case to be a witness against himself.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting U.S. Const. amend. V). In order to safeguard that right, law-enforcement officers must inform a suspect of his rights under the Fifth Amendment—including his right to remain silent in response to the officers' questions—before conducting a custodial interrogation. *Miranda*, 384 U.S. at 444. But "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda*'s ubiquitous admonitions are required "only where there has been such a restriction on [the suspect's] freedom as to render him 'in custody.'" *J.D.B. v. North Carolina*, ⎯⎯ U.S. ⎯⎯, ⎯⎯, 131 S. Ct. 2394, 2402 (2011) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)) (internal quotation marks omitted).

"Custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, ⎯⎯ U.S. ⎯⎯, ⎯⎯, 132 S. Ct. 1181, 1189 (2012). An interview is custodial if "there [has been] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (internal quotation marks omitted). Rather than assessing the suspect's subjective understanding, the Court's task is to examine "all of the circumstances . . . that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *Id.* (quoting *Stansbury*, 511 U.S. at 322, 325) (internal quotation marks omitted). To aid in that determination, courts in this Circuit look to four factors: (1) the location of the

interview; (2) the length and manner of questioning; (3) whether the individual possessed unrestrained freedom of movement during the interview; and (4) whether the individual was told he need not answer questions. *Panak*, 552 F.3d at 465 (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)); *see also United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

### III.

The parties disagree as to whether Saylor was "in custody" for purposes of *Miranda* at the time that Special Agent Keown and Detective Hamilton interviewed him.[3] Judge Lindsay applied the *Panak* factors articulated above and concluded that Saylor was not. (*See* R. 30 at 9–17.) Saylor objects to that conclusion because, in his view, the officers transformed his home into a police-dominated atmosphere and restricted his freedom of movement to a degree associated with formal arrest. (R. 34 at 5–8.) For reasons explained more fully below, the Court overrules Saylor's objection.

### A.

### 1.

Judge Lindsay held that the location of the interview militated against finding that Saylor was "in custody." (R. 30 at 9–14.) Saylor takes exception to that. He concedes that the coercive pressures associated with questioning at the stationhouse will usually be absent in a suspect's own home. (R. 34 at 5–6.) But the halfway or boarding house in which he lived "was hardly a 'normal' home," Saylor says. (*Id.* at 6.) While a close question, and one of first impression in this Circuit, the Court disagrees.

---

[3] There is no dispute that Saylor was "interrogated" as is required before *Miranda*'s safeguards come into play. *See Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980) (holding that the "safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather when a suspect in custody is subjected to interrogation," and defining the same).

To be sure, a halfway or boarding house parts company with the idyllic "home" in certain respects.[4] Saylor's degree of control in deciding whom to permit into his shared dwelling might not be as unfettered as that of the typical homeowner, for example. *Cf. Georgia v. Randolph*, 547 U.S. 103, 113 (2006) ("[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'"). But the house still counts as Saylor's "home turf." *Panak*, 552 F.3d at 466. In the end, that is the important thing.

*Miranda* aims to mitigate the coercive psychological effects inherent when police isolate a "suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner.'" *Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976) (quoting *Miranda*, 384 U.S. at 457). But those dangers are not present in "most in-home interrogations," including this one. *Panak*, 552 F.3d at 466; *see also* Wayne R. LaFave et al., 2 *Criminal Procedure* § 6.6(e) (3d ed.), Westlaw (database updated December 2014) (discussing cases). Saylor's residence (although unconventional) would be far more familiar and much less isolating than, say, the police-dominated atmosphere of a stationhouse. Standing alone, then, the fact that Saylor's residence might be considered atypical does not cut in his favor. *Cf. United States v. Matcovich*, 522 F. App'x 850, 851–52 (11th Cir. 2013) (holding interview noncustodial because, in part,

---

[4] Saylor characterizes the halfway or boarding house as something "between a normal home, and a jail or prison," (R. 34 at 6), but the record is devoid of any evidence supporting that statement. The building looks just like any other. (*See* Government's Exhibit 1A (Photograph of Residence's Exterior).) In addition, there was "no testimony that any law enforcement personnel lived or worked at the house, there was no evidence that the residents could not leave the house at will, and there was no evidence that the house manager was law enforcement personnel." (R. 37 at 3 (Government's Response).) Consequently, the Court must reject Saylor's bleaker portrayal.

8

officers questioned suspect in the familiar setting of the boarding house in which he resided).

**2.**

Saylor responds that even if the location itself was not inherently coercive, the officers' initial show of force and his relative isolation in the kitchen transformed his interaction with Special Agent Keown and Detective Hamilton into a custodial interview. (R. 34 at 6–8.) Judge Lindsay rejected that argument. (R. 30 at 9–14.) Considering the totality of the circumstances of how Saylor's interview unfolded, this Court does too.

While Saylor encountered an unidentified officer brandishing his or her weapon during the initial "sweep" of the first floor, there is no evidence that the officer trained his or her weapon on Saylor. (*See* R. 27 at 7, 11–12 (Riley's Testimony).) Instead, with her firearm holstered, Special Agent Riley approached Saylor and asked if he would go with her to the kitchen. (*Id.* at 11–12, 22, 32.) Soon after securing the home, the other agents also holstered their weapons. (*Id.* at 9–10, 17, 36–37); *cf. United States v. Crooker*, 688 F.3d 1, 11 (1st Cir. 2012) (citing *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011)) (finding no custody where officers holstered weapons after entry team cleared house); *accord United States v. Gray*, Criminal No. 14-04-GFVT, 2014 WL 2872931, at *4 (E.D. Ky. July 24, 2014) (same). The customary practice of officers executing a search warrant with weapons drawn does not—without more—transform subsequent questioning into a custodial interview. *Cf. Swanson*, 341 F.3d at 526, 530–31 (holding that even after officers confronted suspect with drawn weapons, subsequent interview was noncustodial); *United States v. Haque*, 315 F. App'x 510, 519 (6th Cir. 2009) (same).

Ten readily-armed law-enforcement agents sweeping through a home with guns drawn would surely be an unnerving sight. (*See* R. 27 at 4–5, 8–9 (Riley's Testimony).) It is quite possible that, given the right circumstances, such a show of force might result in a custodial environment. *See, e.g.*, *Orozco v. Texas*, 394 U.S. 324, 325 (1969) (holding interview custodial where four armed officers stormed suspect's bedroom at 4:00 a.m. and testified suspect was not "free to go as he pleased" from "the moment he gave his name"). But this is not such a case. *Cf. United States v. Flores*, 193 F. App'x 597, 605–06 (6th Cir. 2006) (finding interview noncustodial even though six officers carrying firearms and wearing body armor surrounded and subsequently entered the suspect's home); *Matcovich*, 522 F. App'x at 851–52. Soon after securing the residence, the agents freed any occupants who had been briefly restrained and told them that they were free to go. (R. 27 at 9–10, 17, 36–37 (Riley's Testimony).) There is likewise no evidence that the officers used their numbers to overwhelm or intimidate Saylor. *Cf. Hinojosa*, 606 F.3d at 883 ("[T]here is nothing to suggest that the officers acted in a hostile or coercive manner. No weapons were drawn, nor were any threats made."). Instead, the number of agents involved would appear to be directly correlated to the number of residents that the agents expected to encounter. (*See* R. 27 at 4–5, 8, 35 (Riley's Testimony).)

Significantly, only two agents participated in Saylor's interview. *Cf. Crooker*, 688 F.3d at 12 (finding no custody where "no more than two agents were in direct conversation with [the suspect] at one time"); *United States v. Vidal*, 85 F. App'x 858, 862 (3d Cir. 2004) (finding interview noncustodial where only three of fourteen agents questioned the suspect in his kitchen); *Gray*, 2014 WL 2873931, at *4 ("[T]hough eight

officers were present on the scene, only two actually participated in the questioning of [the suspect]."). Special Agent Keown described the tone as being "very conversational." (R. 27 at 52 (Keown's Testimony).) In addition, Saylor was not handcuffed at any time during the execution of the search warrant or the subsequent interview. (*Id.* at 10–11, 17 (Riley's Testimony)); *cf. Hinojosa*, 606 F.3d at 883 (finding interview noncustodial where officers never handcuffed suspect or otherwise restrained his freedom of movement); *Conder*, 529 F. App'x at 622 (same); *Flores*, 193 F. App'x at 606 (same).

In sum, despite "the number of officers and presence of weapons, the location of [Saylor's] interview was less like a police station and more like a home, which is generally not considered to be a venue of custodial interrogation." *Gray*, 2014 WL 2873931, at *5. Saylor never asked to leave, to remain silent, or for a lawyer, and the agents never ordered Saylor to answer the questions asked of him. (R. 27 at 13, 32–33 (Riley's Testimony); *id.* at 49–50 (Keown's Testimony); *id.* at 82 (Hamilton's Testimony).) Judge Lindsay correctly concluded that Saylor's home was not transformed into the functional equivalent of an interrogation cell. (R. 30 at 13–14.)

### B.

Judge Lindsay also determined that law-enforcement officers never restrained Saylor or impeded his freedom of movement. (*Id.* at 15.) Saylor objects to that conclusion, particularly to the finding "that no one 'stood guard'" over him and that the "doorway was not blocked" prior to the interview. (R. 34 at 8–9 (quoting R. 30 at 13).) Once the interview began, Saylor also asserts that Special Agent Keown and Detective Hamilton continued to impede his ability to leave by sitting on the side of the table closest to the doorway. (*Id.* at 10–11.) The Court finds neither point persuasive.

**1.**

It is undisputed that law-enforcement officers never handcuffed or physically restrained Saylor before or during his interview with Special Agent Keown and Detective Hamilton. (R. 27 at 13 (Riley's Testimony); *id.* at 50 (Keown's Testimony); *id.* at 82 (Hamilton's Testimony).) Instead, Saylor suggests that the officers implicitly impeded his freedom of movement to such a degree that that no reasonable person in his position would just walk away. (R. 34 at 8–9.) He claims that a uniformed officer stood guard over him and blocked the doorway for the fifteen minutes prior to the interview. (*Id.*) But the record offers little to support Saylor's version of events.

True enough, Special Agent Riley testified that she and other officers generally kept eyes on Saylor until Special Agent Keown and Detective Hamilton's arrived. (R. 27 at 26–27 (Riley's Testimony).) The proffered reason was a common-sense one: Keeping sight of Saylor was necessary to make sure that, in Special Agent Riley's words, "he didn't try to get a knife or something out of the kitchen [with which] . . . to harm himself or anyone else." (*Id.* at 30; *see also id.* at 27, 29–30.) After all, what reasonable person would expect to be left alone with access to knives and whatever else while law-enforcement officers executed a search warrant? *Cf. United States v. Malcolm*, 435 F. App'x 417, 421 n.1 (6th Cir. 2011) (concluding that a reasonable person would not consider himself "in custody" on account of general security protocols, which required the person to be escorted while inside a government building); *United States v. Ambrose*, 668 F.3d 943, 957 (7th Cir. 2012) (same). Hence, the fact that Special Agent Riley and others "kept eyes" on Saylor does not tilt toward a finding of custody. *Cf. Hughes*, 640 F.3d at 435–36 (finding no custody where officer escorted a suspect during the execution

of a search warrant); *United States v. Opoku*, 210 F. App'x 848, 852 (11th Cir. 2006) (same).

In addition, law-enforcement officers at no point "blocked" the kitchen doorway. As Saylor says in his own papers, to the extent an officer remained stationary, he or she stood "in [the] hallway" outside of the kitchen. (R. 34 at 9 (quoting R. 27 at 27) (internal quotation marks omitted).) The passing presence of an officer or two is not in of itself a basis for a reasonable person to believe he would not be free to leave the scene. *Cf. United States v. Craighead*, 539 F.3d 1073, 1086 (9th Cir. 2008) (finding freedom of action restrained when officers placed suspect in the back of an unfinished storage room, closed the door, and an officer in full tactical gear stood "leaning with his back to the door in such a way as to block [the suspect's] exit from the room" and played no other part in the interview process).

### 2.

Even so, Saylor argues, Special Agent Keown and Detective Hamilton impeded his ability to leave by sitting on the side of the table closest to the doorway. (*See* R. 34 at 10–11.) The argument rings hollow, however, where the only record evidence suggests that Saylor decided to sit in that location before Special Agent Keown and Detective Hamilton ever entered the room. (*See* R. 27 at 62 (Keown's Testimony)); *cf. United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (concluding suspect not in custody despite testimony that the suspect "was ordered into the kitchen, 'cornered' by several agents, and interrogated," when other witnesses testified that the suspect "went into the kitchen voluntarily"). Lastly, there is no record evidence that any law-enforcement officer remained in or near the kitchen after Special Agent Keown and Detective

13

Hamilton arrived. (R. 27 at 48–49 (Keown's Testimony); *id.* at 81 (Hamilton's Testimony).) Judge Lindsay correctly held that the restraint on Saylor's freedom of movement bore no resemblance to the degree associated with a formal arrest.

### VI.

For the foregoing reasons, and being otherwise sufficiently advised;

**IT IS HEREBY ORDERED** that Defendant Thomas Saylor's Objection to Judge Lindsay's Findings of Fact and Conclusions of Law and Recommendation (R. 34) is **OVERRULED**;

**IT IS FURTHER ORDERED** that Judge Lindsay's Findings of Fact and Conclusions of Law and Recommendation (R. 30) is **ADOPTED** and is **INCORPORATED** by reference in this Memorandum Opinion and Order;

**IT IS FURTHER ORDERED** that Defendant Thomas Saylor's Motion to Suppress (R. 20) is **DENIED**;

**IN IS FURTHER ORDERED** that this matter is set for Telephonic Further Proceedings on **November 9, 2015, at 11:30 a.m. EST**, for scheduling purposes.

**IT IS SO ORDERED.**

Date:

cc: Counsel of Record